**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**James BRYANT, Defendant-Appellant.**

**No. 74–1466.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 24, 1975.

Decided May 22, 1975.

---

Francis E. Andrew, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., Gary L. Starkman, Theodore T. Scudder, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before CASTLE, Senior Circuit Judge, and SWYGERT and STEVENS, Circuit Judges.

CASTLE, Senior Circuit Judge.

This vote fraud case arises out of the March 21, 1972 primary election in Chicago, Illinois, involving contests for state and federal offices. Defendant James Bryant, a Democratic precinct captain for the twentieth precinct in Chicago's twenty-seventh ward, was convicted after a nonjury trial[1] of conspiracy to injure the Constitutional and statutory rights of voters by causing fraudulent votes to be cast in that election in violation of 18 U.S.C. § 241.[2] As has been recently reiterated, that section applies to primary as well as general elections, and "embraces a conspiracy to stuff the ballot box at an election for federal officers, and thereby to dilute the value of votes of qualified voters . . . ." Anderson v. United States, 417 U.S. 211, 226, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974); United States v. Barker, 514 F.2d 1077, at 1078–79 (7th Cir. 1975). On appeal, the defendant does not contest the fact that fraudulent votes were cast by four election judges who worked at the polling place in the precinct.[3] He argues, however, that the evidence is insufficient to show that he participated in a conspiracy with those judges to cast fraudulent votes for federal offices.

Viewed in the light most favorable to the government, the evidence shows that election judge Dorothy Smith testified that the defendant placed a list with some names on it on a table around which the election judges sat, said that "too many people hadn't been in," and asked us to "take care of it [the list]." Although the defendant did not elaborate on what "take care of it" meant, Smith assumed that the defendant meant that she was to vote for the people on the list. Another election judge, Carolyn Hilliard, testified that the defendant looked at the registration list to determine who had not voted, and then suggested that the judges fill out registration slips for those who were not coming out to vote.

This evidence would clearly be sufficient to show beyond a reasonable doubt the defendant's participation in a conspiracy to cast fraudulent votes. The defendant asserts, however, that the above evidence cannot be relied on to support his conviction. First, he argues that the district court's Memorandum Decision shows that it did not credit

---

1. The defendant was initially tried before a jury, but a mistrial was declared due to the jury's inability to reach a verdict. By stipulation, the parties submitted the case to the trial court for decision based on the evidence previously before the jury.

2. That section provides:

   If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

   If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—

   They shall be fined not more than $10,000 or imprisoned not more than ten years, or both; and if death results, they shall be subject to imprisonment for any term of years or for life.

3. The four election judges, Dorothy Smith (a/k/a Dorothy Smith Turner), Vickie Modica, Bernice Baker, and Carolyn Clark (a/k/a Carolyn Clark Hilliard) had previously pleaded guilty to offenses stemming from their election activities. A fifth election judge was not involved. The four convicted judges were named as unindicted coconspirators in the indictment charging the defendant with violation of section 241, and all except for Baker were government witnesses.

Smith's testimony. Second, he contends that the district court improperly relied on Hilliard's prior statements to the grand jury and to the FBI, which were used only to refresh Hilliard's recollection and which were not offered into evidence, to give credence to Hilliard's trial testimony that it was the defendant who suggested the vote fraud. The defendant's assertions rest on the following paragraph from the district court's decision:

> . . . [The election judges] all knew the defendant but were obviously reluctant to implicate him. The only one who did so in court was Carolyn Hilliard Clark [sic], and her testimony on this point vacillated in the extreme, depending largely on which side was asking the questions and whether her attention was being directed to her prior statements which incriminated the defendant before the Grand Jury and to the F.B.I. The court credits her incriminating testimony because it is consistent with the circumstances and with her past incriminating statements.

We cannot agree with the defendant's argument that, since "the naked words of witness Turner [Smith] implicated James Bryant in some respects . . ." (Defendant's Reply Brief at 5), the district court's statement that Hilliard was the only witness who implicated the defendant must mean that the court chose not to believe Smith. The meaning of the district court's statement must be evaluated in light of the entire decision and the record.

First, in its decision, the district court explicitly stated:

> At some time during the day [Bryant] gave a list of voters' names to Dorothy Smith. The list was never seen again after the polls closed, but Dorothy Smith testified that it was in the defendant's handwriting and that he said

that too many of the names on the list had not been in and that the list should be "taken care of."[4]

The district court found these events to have occurred despite the fact that other election judges testified that they did not see any such list or hear any such direction made by the defendant. Clearly, then, the district court must have found Smith to be a credible witness because it believed her version of the events that transpired.

■ Second, the district court's conclusion that Hilliard was the only one who implicated the defendant is consistent with the court also relying on the testimony of Smith. Hilliard's testimony provided direct evidence of Bryant's involvement in the conspiracy. Hilliard was the only witness who linked Bryant to the conspiracy by testifying that Bryant explicitly stated that false registration slips should be filled out for those voters who were not coming out to vote. The evidence provided by Smith's testimony as to the defendant's involvement was circumstantial. The defendant did not make a direct statement to Smith, but instead, she inferred from his statement to "take care of it" that he meant for the judges to cast fraudulent votes. This difference in the nature of the testimony of Smith and Hilliard, in conjunction with the fact that the decision itself shows that the district court found Smith to be credible, convinces us that by stating that Hilliard was the only witness who implicated the defendant, the court did not indicate that it disbelieved Smith, but rather, the court meant that Hilliard provided the only direct evidence of the defendant's involvement. Consequently, it is proper to rely on evidence provided by Smith's testimony to support the district court's finding of guilt. Cf. McClain v. United States, 417 F.2d 489, 492 (9th Cir. 1969),

---

4. Smith only testified that the list was handwritten and not that it was in the defendant's handwriting. Since we are here concerned with whether the district court believed Smith to be a credible witness, the court's misstatement does not affect that evaluation. Further, Smith's testimony shows the defendant's participation regardless of whether or not the list was in his handwriting.

cert. denied 397 U.S. 965, 90 S.Ct. 996, 25 L.Ed.2d 257 (1970).

■ As to Hilliard's incriminating testimony, we do not believe that the district court improperly credited that testimony by relying on evidence outside the record. The defendant argues that by labeling the grand jury testimony and the FBI report as "incriminating," this indicates that the district court must have gone outside the record to review those documents, since they were used only to refresh Hilliard's recollection and were not introduced into evidence. The record shows, however, that although Hilliard gave different versions as to who suggested the fraud, the version that incriminated the defendant was given after her recollection was refreshed by her prior statements. The Government was faced with an obviously reluctant witness, and we believe the district court did no more than to draw the fair inference that the correct version of the events that occurred was given by Hilliard after her memory was refreshed. Moreover, on appeal it is presumed that the court in a bench trial considers only evidence properly admitted. United States v. Wolff, 409 F.2d 413, 416 (7th Cir.), cert. denied 396 U.S. 858, 90 S.Ct. 124, 24 L.Ed.2d 108 (1969). Accordingly, we do not find that the district court improperly credited Hilliard's testimony, and this evidence may also be used to support the district court's finding of guilt.

■ The defendant's final contention is that even if it is found that he was part of a conspiracy to cast fraudulent votes, the evidence is insufficient to show that the specific intent of the conspiracy was the casting of fraudulent votes for federal offices. The evidence shows, however, that in the twentieth precinct of the twenty-seventh ward there were 215 Democratic ballot appli-

cations resulting in 195 votes cast in the race for the Democratic Congressional nomination, and 190 votes cast in the race for the Democratic nomination to the United States Senate. Since at least fifty of the Democratic ballots were admittedly fraudulent, there could have been at most 165 legitimate votes cast for each federal office. Consequently, at least thirty fraudulent votes were cast in the Congressional race, and at least twenty-five fraudulent votes were cast in the Senatorial contest.[5] This is sufficient evidence from which it can be inferred beyond a reasonable doubt that the conspiracy of which the defendant was a member contemplated the casting of fraudulent votes for federal offices. United States v. Barker, supra, 514 F.2d at 1079–80.

The judgment of conviction is Affirmed.

---

5. The primary also involved a contest for the Democratic nomination for President. However, since the number of legitimate ballots (165) exceeded the number of votes actually cast (115), it is not possible to tell mathematically whether any fraudulent votes were voted for that office. For the same reason, although eighteen of thirty-eight Replication ballot applications were fraudulent, it it not possible to ascertain whether any fraudulent votes were cast in the Republican contests for federal office.